**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CAMERON NORTH,** | ) | **CASE NO. 1:15-cv-1124** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **vs.** | ) | <u>**OPINION AND ORDER**</u> |
| | ) | |
| **COUNTY OF CUYAHOGA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**I. Background**

On May 13, 2013, Cameron North (Plaintiff) was an inmate at the Cuyahoga County

Correctional Center (the Jail) and suffered a stroke rendering him permanently disabled. Compl.,

¶ 1, Doc #: 1-1. Plaintiff filed the Complaint in Cuyahoga County Common Pleas Court on filed

May 12, 2015 alleging federal and state law claims pertaining to his medical care at the Jail. Doc

#: 1-1. Defendants Cuyahoga County, et al. filed a Notice of Removal to this Court on June 3,

2015. Doc #: 1-2. Defendants then filed an Answer on November 25, 2015. Doc #: 11.

On April 5, 2016, Plaintiff filed his First Amended Complaint adding new party

defendants Father Mirolovich, M. Elhalaby, C. Clack, and S. Hester in place of previously

described "Unnamed Nurses and/or Unnamed Correctional Officers." *Compare* Compl. ¶¶ 8–10

*with* First Am. Compl., ¶¶ 14–17, Doc #: 21. The First Amended Complaint contained four claims: a 42 U.S.C. § 1983 claim against the individual defendants for deliberate indifference to Plaintiff's serious medical needs; a 42 U.S.C. § 1983 claim against Cuyahoga County for failure to adequately train, supervise, screen, test, and discipline the Jail and for failure to institute adequate policies and procedures; a state law claim of willful, wanton, reckless, and negligent conduct; and a state law claim of negligence. ¶¶ 76–88. Defendant Mirolovich filed his Answer to the First Amended Complaint on July 15, 2016. Doc #: 36. Shortly after, Defendants Cuyahoga County, Clack, Elhalaby, and Hester (collectively, County Defendants) filed their Answer to the First Amended Complaint. Doc #: 39.

Defendant Cuyahoga County filed Motions to Dismiss both the Complaint and the First Amended Complaint, and Defendants Elhalaby, Hester, and Clack filed a Motion to Dismiss the First Amended Complaint; all three motions were based in part on statute of limitations grounds. Doc ##: 5, 22, 33. In each Order denying those motions, the Court indicated that it may consider statute of limitations arguments in later filings because the statute of limitations issue may turn on questions of fact resolved during discovery. Doc ##: 9, 29, 40.

On May 5, 2017, County Defendants filed two Motions for Summary Judgment. Doc ##: 59, 64. On June 14, 2017, Plaintiff filed and the Court granted Plaintiff's voluntary motion to dismiss County Defendants Elhalaby and Hester without prejudice. Doc #: 74.

This Order decides solely Defendant Mirolovich's Motion for Summary Judgment, Doc #: 59.[1]

---

[1]The Court notes that the briefings would have been more beneficial to the Court had each side used more accurate citations and used pincites throughout their briefs. Citations to twenty minute phone calls without relevant time markers and "*id.*" citations with no clear

## II. Summary Judgment Framework

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "On the other hand, if a reasonable jury could return a verdict for the nonmoving party, summary judgment for the moving party is inappropriate." *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant bears the initial burden of showing that there is no material issue in dispute. *Id.* at 607 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "A fact is deemed material only if it might affect the outcome of the lawsuit under the governing substantive law." *Id.* (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). In reviewing a motion for summary judgment, the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Id.* (citing *Kalamazoo Acquisitions, LLC v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005)).

## III. Factual Background

Plaintiff entered the Jail in February 2013. C. North Dep., Oct. 19, 2016, 37:21–24, Doc #: 56-1. Shortly after arriving, Plaintiff became a "trustee," which entailed working in the kitchen and also having various privileges such as more desirable living accommodations. *Id.* at 38:1–39:17.

---

references are counterproductive and require the Court to waste time sifting through evidence that should have been more carefully organized and referenced.

During a phone call with his mother in the morning of March 27, 2013, Plaintiff mentioned that a correctional officer (CO) had accused him of being lazy during his duties in the kitchen and that, on his way back from the kitchen, he explained to a different CO that he was not lazy but that he "pulled a muscle in [his] arm." Jail Call between C. North and E. North on March 27, 2013 (Disc 2 J400, 3R1G20ZM) 0:52–01:29, Doc #: 64-1. Plaintiff said he believed that the CO reported Plaintiff's injury to the Jail's medical unit as a result of his comments on his way back from the kitchen. *Id.* at 01:20-01:32. Later that day, Plaintiff went to the medical unit where he signed a refusal of care form which stated "arm hurt earlier—better now." Refusal of Medical Treatment (Shobert Dep. 372), Doc #: 72-7.

Two days later, on March 29, Plaintiff complained to his grandmother that his right thumb hurt and that he had been waking up sweating. Jail Call between C. North and M. Palumbo on March 29, 2013 (Disc 1 J400, 3T1G200Z) 12:09–12:38, 17:29-17:41. On April 2, Plaintiff again mentioned to his grandmother that his hand was swollen, but he said he did not want to report his medical condition for fear of losing his trustee position. Jail Call between C. North and M. Plumbo on April 2, 2013 (Disc 1 J400, 421G2047) 00:43–01:18. He assured his grandmother that he would report his condition if it worsened. *Id*. at 01:30–01:40.

Plaintiff recalled experiencing pain in his side and a bump on his hand by late April or early May. C. North Dep. at 42:5–43:9. During a phone call on May 7, he described having pain down his right side which he was medicating with ibuprofen.[2] Jail Call between C. North and M. Plumbo on May 7, 2013 (Disc 1 J400, 571G2007) 01:10–01:30.

On May 8, Plaintiff returned to the medical unit because of his pain. Progress Notes

---

[2]The record does not describe how he got this ibuprofen.

(Butler Dep. 100), Doc #: 72-1. The record is subject to dispute concerning what brought Plaintiff into the medical unit that day. The record supports at least three alternatives. First, Plaintiff could have gone because his mother called the prison concerning his medical condition. Cuyahoga Cty. Corr. Ctr. Med. Concerns (Shobert Dep. 373), Doc #: 72-7. Plaintiff's mother first called the Jail and talked to Sgt. Christopher who forwarded her call to Sandra Hammond in the Warden's Office so that Plaintiff's mother could create a "medical concern notice." Christopher Report (Ex. 4), Doc #: 72-9. Sgt. Christopher explained in his deposition that, from there, someone in the Warden's Office would typically complete the medical concern notice and then email that notice to a designated person in the medical unit. Christopher Dep., Nov. 1, 2016, 73:5–15, Doc #: 58-1. This first possibility is supported by Plaintiff's May 8 medical records which begin with the words "Warden concern:"—possibly referring to the medical concern notice from the Warden's Office. Progress Notes. Second, Plaintiff could have gone because he previously completed a "kite" requesting medical attention. C. North Dep. at 85:20–86:2. However, Plaintiff's expert witness testified that, if a kite existed, it should have been in Plaintiff's medical records and that he could not find any evidence in Plaintiff's medical records that Plaintiff had ever submitted a kite. Mendel Dep., April 24, 2017, 59:2–60:1, Doc #: 72-12. Third, Plaintiff could have gone because he complained to various COs about his pain. C. North Dep. at 87:6–13.

Regardless of how Plaintiff got to the medical unit, once there, a member of the medical staff recorded Plaintiff's vital signs and reason for Plaintiff's visit: "Warden concern: [patient complains of] neck and upper [left] shoulder and lower abdominal under rib pain." Progress Notes. This unnamed medical staff person indicated the conclusion of his or her notes with a

signature. *Id*. The signature on the Progress Note is illegible, and no party has indicated this staff member's name in their briefings.

Following the preliminary notes and vital signs, the attending nurse practioner Defendant Mirolovich began his evaluation and his portion of the progress notes. Elhalaby Dep., Oct. 25, 2016, 28:14–16, Doc #: 61-1. The parties do not dispute that Defendant Mirolovich did not review Plaintiff's medical records on May 8. Mirolovich Dep., Nov. 22, 2016, 98:20–99:10, Doc #: 55-1. Defendant only reviewed "the medical history that [he] obtained from [Plaintiff] in the course of the visit." *Id.* at 98:22–23.

In Defendant Mirolovich's section of the medical notes, he wrote that Plaintiff reported "a 2-day [history] of [left] lateral neck pain associated [with left upper quadrant] pain [with] deep inspirations." Progress Notes; *accord* Mirolovich Dep. at 101:6–9. Defendant Mirolovich also noted that Plaintiff denied any trauma and denied any other symptoms. Progress Notes; *accord* Mirolovich Dep. at 102:6.

In assessing Plaintiff, Defendant Mirolovich addressed the lower abdominal pain as "undifferentiated abdominal pain." Progress Notes; Mirolovich Dep. at 106:1–2. In response to Plaintiff's shoulder plain, Defendant Mirolovich wrote that he could not find point tenderness anywhere on the shoulder but also noted that the shoulder pain might be from another part of the body and not from the shoulder.  Progress Notes; Mirolovich Dep. at 106:2-10. In his deposition, Defendant Mirolovich explained that problems such as inflammation of the gallbladder could result in shoulder pain. Mirolovich Dep. at 106:13-23.

As a result of the examination, Defendant Mirolovich ordered blood tests to be taken the next morning. Physician's Order Form (Butler Dep. 101), Doc #: 72-1; Mirolovich Dep. at

107:7-12. He also ordered 400mg of ibuprofen to be taken as needed. *Id.*

Defendant Mirolovich also wrote in the order form "in-house [urinalysis] done." What "done" meant in the context of this order is unclear.  In his deposition, Defendant Mirolovich explained that "done" meant that the urine sample was *acquired*:

> Q:    The urinalysis that is done in the jail is done in-house; right?
> **A:    Yes, it is.**
>         **What do you mean by done?**
>         **Obtained?**
> Q:    The urine is obtained?
> **A:    It's obtained, yes.**
> Q:    And what happens to the urine?
> **A:    It's sent to the hospital.**

Mirolovich Dep. at 73:4–12. Defendant Mirolovich explained in his deposition that his notes indicate that the medical staff had obtained Plaintiff's urine but that the sample still needed to be sent to the hospital. Mirolovich Dep. at 73:4–16. Alternatively, Defendant Clack, a nurse working in the Jail, interpreted "done" to mean that the urinalysis was *complete*. Defendant Clack's signature appears at the bottom of the Order Form signifying that she reviewed Defendant Mirolovich's orders, and she explained that Defendant Mirolovich writing "in-house UA done" meant that the urinalysis was finished. Clack Dep., Nov. 1, 2016, 101:15–22, 101:25–102:2, Doc #: 60. She interpreted this to mean that Defendant Mirolovich had looked at the results and "wanted to document that it was done." *Id.* at 102:15–103:8. Defendant's expert also states that he understood the Physician's Order Form to indicate that the urinalysis was complete; however, he noted, the record does not contain the results of that test. Mendel Dep., April 24, 2017, 113:12–20.  Plaintiff could not recall whether he had given a urine sample for this urinalysis. C. North Dep. at 80:4–8.

According to depositions of various medical staff at the Jail results from blood tests and urinalyses were typically available anywhere from a few hours to a few days. *See e.g.,* Elhalaby Dep. at 51:20–52:19, 55:25–57:5 (stating that the medical staff could get lab results within a few hours when necessary); Ruzicka Dep., Jan. 13, 2017, 61:2–7, Doc #: 57-1 (stating that blood test results were usually available within 24 hours but that it could take longer over weekends); Clack Dep. at 72:4–12 (stating that the turnaround for the urinalysis is about two days); Collingwood Dep., Dec. 22, 2016, 54:3–9, Doc #: 72-5 (stating that blood work could be done in a few days); Collingwood Dep. at 95:18–22 (stating that urinalysis results could be attained immediately if necessary).

The next day, May 9, Plaintiff's mother called the jail again, and Sgt. Christopher advised her to submit another medical concern form with the Warden's Office. Christopher Report. Christopher's report notes that he informed Nurse Ruzicka of the call; however, Ruzicka does not recall receiving any verbal or written complaints on that day. Ruzicka Dep. at 86:2–5.

The blood Defendant Mirolovich ordered for the blood tests was never drawn. No evidence exists in the record that anyone attempted to take Plaintiff's blood on May 9 or at any other time. There is evidence that Plaintiff tried to refuse the blood test. In a phone call with his mother on May 10, Plaintiff explained that he tried to refuse the blood tests, saying:

> I tried getting out of it. I tried telling her, you know, I want to sign against medical advice. I don't want blood work. I feel fine. The pain went away. And the CO in the kitchen was standing right there and she said. . . . She said, well, if it didn't hurt that bad, you wouldn't have called complaining to your mom.

Transcript of Telephone Conversation Between Cameron North and Elizabeth North (5A1G20Q6), 6:14–23, Doc #: 64-3; Jail Call between C. North and E. North on May 10, 2013

-8-

(Disc 1 J400, 5A1G20Q6) 05:29–05:48. However, during Plaintiff's deposition, he was asked, "Isn't it true that you were set to go for labs and then you refused to go?" Plaintiff responded, "No. That is absolutely wrong."[3]  Cameron North Dep. at 55:4-8. Plaintiff testified that, after his appointment with Defendant Mirolovich, Plaintiff reminded COs that he was supposed to get blood drawn. *Id*. at 96:21-97:7. Plaintiff could not recall how many times he mentioned this to his COs but knew that it was multiple times since the COs started to "joke" with Plaintiff that he would be moved from his trustee pod to a gang pod. *Id.* at 98:11–23.

On May 10, Defendant Mirolovich revoked Plaintiff's trustee status. Physician's Order Form (Butler Dep. 102), Doc #: 72-1. CO Butler allowed Plaintiff to stay in the trustee pod. Butler Dep., Dec. 12, 2016, 45:17-22. However, Plaintiff knew, now that his trustee status was revoked, he could be moved to a less desirable pod at any moment. Jail Call between Cameron North and Elizabeth North on May 12, 2013 (Disc 1 J400, 5C1G20R7) 15:20-15:37. Starting on May 10, when Defendant Mirolovich revoked Plaintiff's trustee status, the Jail's log book consistently stated—on May 10, 11, and 12—that Plaintiff could not work until cleared by the medical staff. Official Log Book (Ex. 5) 3–6, Doc #: 72-13.

Plaintiff said he believed that his trustee status revocation and reclassification to a less desirable pod were the results of his mother calling the jail, and he urged her to stop calling the Jail about his medical condition. *See* Transcript of Telephone Conversation Between Cameron North and Elizabeth North (5A1G20Q6, Ex. C)  2:3-13; *see also* Jail Call between C. North and E. North on May 10, 2013  (Disc 1 J400, 5A1G20Q6) 0:18–0:38; *see also* Telephone

---

[3]Because Plaintiff was responding to a compound question, it is not clear what he was denying.

Conversation Between Cameron North and Elizabeth North (5C1G20R7, Ex. D) 19:1–2, Doc #: 64-3; *see also* Jail Call between C. North and E. North on May 12, 2013 (Disc 1 J400, 5C1G20R7) 13:49–14:11.

On May 13, Plaintiff suffered a stroke. The precise timing of events that day is unclear, but three sources help explain that day's events: Plaintiff's testimony, medical records, and jail records.

Plaintiff remembers talking to his friend on the phone that day, and he next remembers being rolled down the Jail hallway in a wheelchair. C. North Dep. at 56:12–57:25. Once he arrived at the medical unit, Plaintiff then recalls being asked asking a multitude of questions and medical staff accusing him of lying when they asked Plaintiff to raise both of his arms but he could only raise his right arm. C. North Dep. at 58:7–15; 59:5–7.

Plaintiff's medical records also describe the events on May 13. Nurse Collingwood continued to update Plaintiff's medical notes throughout the event:

> 5/13/13 at 9:20 p.m. Medical Emergency; sitting on floor near phone; color pale; skin warm and dry; following simple commands; assisted to wheelchair, but inmate dragging [left] foot/leg [;therefore,]assisted to gurney and transported to dispensary [vital signs:] B/P 115/54 [heart rate] 58 [respiration] 16 SPO2, remains awake and alert–when asked what was wrong with him he stated "nothing nothing wrong," observing in dispensary. 9:45 [p.m.] Observed [moving][4] [left] arm and [left] leg on gurney. 9:50 [p.m.] summoned me over to say "I want to go back to the block;" continued to observe. 10 [p.m.] [vital signs:] 122/52 103 20; remaining alert, moving [right] arm to lift [left] arm; restless on gurney–[Collingwood's signature]
>
> 10:15 [p.m.] Examined by NP; EMS called [Collingwood's signature]

---

[4]When reading her notes in her deposition, Collingwood read, "9:45, observed–I'm not sure exactly what that says–maybe moving left arm and left leg on gurney." Collingwood Dep. at 98:1–3.

-10-

Progress notes (Butler Dep. 103), Doc #: 72-1; *see also* Collingwood Dep. at 96:25–98:10.

Jail records also provide some details of that day. CO Diaz wrote that other inmates alerted of a possible medical emergency at 9:17 p.m. Combination Report (Collingwood Dep. Ex. 8) 1, Doc #: 72-3. On the following page of the report, the Floor/Area Supervisor's Review states that the medical emergency was secured at 9:31 p.m. and that Plaintiff was transported to Metro Hospital via EMS at 10:45 p.m. *Id* at 2.

Once at the hospital, doctors concluded that Plaintiff had suffered a stroke due to endocarditis. C. North Dep. at 59:23–60:16. This endocarditis required open-heart surgery and subsequent therapy. *Id.* at 63:11–16, 61:21–62:3. As a result of the stroke, Plaintiff had lost some use of his left side. *Id.* at 64:21–65:13.

## IV. Discussion

### A. Defendant Mirolovich in His Official Capacity

In addition to the claims against Defendant Mirolovich individually, which are discussed in more detail below, Plaintiff also brings a § 1983 claim against Cuyahoga County in its own name, Defendant Clack in her official capacity, and Defendant Mirolovich in his official capacity. First Am. Compl. at 4, 5, 14. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Because bringing a claim against Defendant Mirolovich in his official capacity is equivalent to bringing a claim against the county as a government entity, *Colely v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015), the Court finds the claim against Defendant Mirolovich in his official capacity is duplicative with the claim brought against Defendant Clack in her official

-11-

capacity and the claim against Cuyahoga County in its own name.[5] Cuyahoga County is represented by separate counsel and has separately filed a motion for summary judgment. Therefore, the Court defers ruling on the official capacity claim against Defendant Mirolovich until the motion for summary judgment filed by Cuyahoga County is ripe.

### B. Statute of Limitations

Defendant Mirolovich contends that the claims against him are barred because of statutes of limitations. To determine whether a claim is timely, the Court must determine the length of the statute of limitations, the date of accrual of the statute of limitations, and the effective date of filing.

### 1. Length of the Statute of Limitations

Typically, the Court would look to the statute containing the cause of action for the relevant statute of limitations. Under Ohio Revised Code § 2305.10, an action in negligence has a two year statue of limitations. *Feeney v. Eschack*, 718 N.E.2d 462, 464 (Ohio Ct. App. 1998); *Schmitz v. NCAA*, 67 N.E. 852, 858 (Ohio Ct. App. 2016). The state claim of willful, wanton, reckless, negligent conduct also has a two year statute of limitations. This claim is "technically not a separate cause of action [from negligence], but a level of intent which negates certain defenses which might be available in an ordinary negligence action." *Ward v. County of Cuyahoga*, 721 F. Supp. 2d 677, 694 (N.D. Ohio 2010) (quoting *Cincinnati Ins. Co. v. Oancea*,

---

[5]In a footnote in his brief, Plaintiff alludes to MetroHealth as "a separate and distinct political subdivision." Pl.'s Opp'n 22–23 n.10, Doc #: 72. To the extent Plaintiff is suggesting MetroHealth may also be a defendant in this case, Plaintiff is incorrect. Plaintiff has alleged no claims against MetroHealth anywhere in his First Amended Complaint. Rather, Plaintiff's only claim against an institutional entity (i.e., the "Second Claim for Relief") explicitly states that the claim is against Cuyahoga County, only. First Am. Compl. 14, Doc #: 21.

2004 WL 1810347, *17 (Ohio Ct. App. 2004)). Therefore, both state law claims have a two year statute of limitations.

In contrast, 42 U.S.C. § 1983 does not have a statute of limitations. Instead, the Court must refer to an analogous state claim. Courts generally apply a state's personal injury statute of limitations to claims brought under § 1983. *Hawkins v. Spitters*, 79 F. App'x 168, 169 (6th Cir. 2003) (citing *Wilson v. Garcia*, 471 US 261 (1985)); *see also Owens v. Okure*, 488 US 235, 236 (1989) (holding that the general personal injury statute of limitations applies to a § 1983 action); *see also Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993) ("Courts look to the personal injury laws of the state where the injury occurred to determine the statute of limitations in a section 1983 case") (citation omitted); *see also Miles v. Vanderburgh Cty. Jail*, 335 F. App'x 633, 635 (7th Cir. 2009) ("When the forum state has various statutes of limitations for different types of injury, a federal court must use the general period of limitation adopted by the state for personal-injury suits, which in Indiana is two years.") (citations omitted); *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (holding an Eight Amendment deliberate indifference claim is considered to be a personal injury action).

Defendant Mirolovich argues that the analogous state claim is a claim of medical malpractice which has a one year statute of limitations. Mirolovich's Mot. for Summ. 9, Doc #: 59. However, case law is clear that courts apply a state's personal injury statute of limitations for § 1983 claims. In Ohio, the statute of limitations for personal injury claims is two years. *Gates v. Precision Post Co.*, 659 N.E.2d 1241, 1241 (Ohio 1996). Therefore, treating the § 1983 claim as a personal injury claim for statute of limitations purposes, the § 1983 claim has a two year statute of limitations. *Browning v. Pendleton*, 869 F2d 989, 989 (6th Cir. 1989) (en

-13-

banc) (holding that the statute of limitations for § 1983 claims in Ohio is two years).

### 2. Accrual of the Statute of Limitations

For statute of limitations purposes, the time starts when the plaintiff knew or had reason to know of the injury that is the basis of the action. *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009) (citing *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005)). Having reason to know of the injury means that the plaintiff should have discovered the injury through exercising reasonable diligence. *Scott*, 577 F.3d at 646 (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). In a claim for deliberate indifference to serious medical needs, accrual is based not on discovery of medical *problems*, but rather on discovery of *indifference* to serious medical needs. *See Scott*, 577 F.3d at 646; *see also Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001).

Here, Defendant Mirolovich and Plaintiff do not dispute that the § 1983 claim accrued on May 13, 2013. Mirolovich's Mot. for Summ. J. 15 n.2; Pl.'s Opp'n at 28. Accordingly, The Court finds, for the purposes of this Motion, that May 13, 2013, is the accrual date.[6]

### 3. Conclusion of the Statute of Limitations Period

The end date, for statute of limitations purposes, is when the claim is filed; however, here, two filing dates exist. On May 12, 2015, Plaintiff filed the original Complaint. Summons and Compl. at 2. On April 5, 2016, Plaintiff filed the First Amended Complaint. First Am. Compl. at 1. Because Defendant Mirolovich was added in the First Amended Complaint, the applicable date for statute of limitations depends on whether the First Amended Complaint

---

[6]The Court notes, however, based on the record, Defendant Mirolovich's last contact with Plaintiff or involvement with Plaintiff's medical case appears to be when Defendant Mirolovich revoked Plaintiff's trusteeship on May 10, 2013. Cuyahoga County Corrections Center Physician's Order Form. Consequently, the accrual date for Defendant Mirolovich may actually be before the agreed upon May 13 date.

-14-

relates back to the original Complaint. The relevant rule for relation back is Fed. R. Civ. P.

15(c)(1)(C):

> (c)  Relation Back of Amendments
>> (1) *When an Amendment Relates Back.* An amendment to a pleading
>> relates back to the date of the original pleading when:
>>> . . .
>>> (C) the amendment changes the party or the naming of the
>>> party against whom a claim is asserted, if Rule 15(c)(1)(B) is
>>> satisfied and if, within the period provided by Rule 4(m) for
>>> serving the summons and complaint, the party to be brought
>>> in by amendment:
>>>> (i) received such notice of the action that it will not be
>>>> prejudiced in defending on the merits; and
>>>> (ii) knew or should have known that the action would
>>>> have been brought against it, but for a mistake
>>>> concerning the proper party's identity.

The First Amended Complaint does not relate back to the original Complaint for two

reasons. First, Defendant Mirolovich was not put on notice by the original Complaint. Such

notice can be actual or constructive. *Ham v. Sterling Emergency Servs. of the Midwest*, 575 F.

App'x 610, 617 (6th Cir. 2014). Defendant Mirolovich did not have actual notice. The original

Complaint was filed on May 12, 2015, and served on May 13, 2015, to "Cuyahoga County c/o

Department of Law." Summons and Compl. at 2. At the time the original Complaint was filed,

Rule 4(m) required that a defendant be served within 120 days after the complaint is filed.

Fed. R. Civ. P. 4(m) (2015). Because Defendant Mirolovich was not named in the original

Complaint, the Clerk of Court issued a summons to Defendant Mirolovich only after the First

Amended Complaint had been filed, on May 2, 2016. Mirolovich Summons 1, Doc #: 24. The

Clerk mailed this summons by certified mail, but the summons was returned to the Clerk

unclaimed. Mirolovich Return of Service, Doc #: 30. Then, Plaintiff successfully notified

-15-

Defendant Mirolovich via personal service on June 21, 2016. Mirolovich Proof of Service, Doc #: 32. No evidence exists in the record that Defendant Mirolovich received actual notice of either the original Complaint or the First Amended Complaint before he was personally served on June 21, 2016. Clearly, the service of the First Amended Complaint did not fall within the allotted 120 days from the filing of the original Complaint. Thus, Defendant Mirolovich did not have actual notice in time to satisfy the statute of limitations.

Defendant Mirolovich also did not have constructive notice. The Sixth Circuit lists relevant factors when determining if constructive notice exists. These include "the relationship of the new defendants to the defendant(s) originally named, whether the same attorney represented both original and new defendants, and whether the new defendants are officials of the original defendant." *Force v. City of Memphis*, 101 F.3d 702 (table), 1996 WL 665609, at *2, 1996 U.S. App. LEXIS 30233, at *8 (6th Cir. 1996) (unreported) (citing *Berndt v. Tennessee*, 796 F.2d 879, 884 (6th Cir. 1986)). Here, Defendant Mirolovich was an employee of MetroHealth working at the Jail during the relevant time period. Mirolovich Dep. at 24:1–8; 12:12–17. Defendant Mirolovich and County Defendants are represented by separate counsel. Furthermore, Defendant Mirolovich was not an official of any of the original defendants. Specifically, based on the evidence in the record, Defendant Mirolovich "[was] not [a] 'high official[]' of the [or county] and would not have been involved in the [county's] legal affairs so as to have notice of the institution of the action." *Force*, 1996 WL 665609, at *2. Considering these factors, the Court concludes Defendant Mirolovich did not have constructive notice.

Second, even if Plaintiff were to establish that Defendant Mirolovich knew or should have known that Plaintiff would eventually bring the claims against him, Plaintiff has still failed

-16-

to establish that his lack of knowledge of Defendant Mirolovich's identity was due to a mistake as Rule 15(c) requires.

"Mistake" in Rule 15(c)(1)(C)(ii) means an actual mistake. *Brown v. Cuyahoga County*, 517 F. App'x 431, 435 (6th Cir. 2013) (citing *Krupski v. Costa Crociere S.p.A.*, 130 S.Ct. 2485, 2494 (2010)). And, in the Sixth Circuit, courts have a longstanding precedent for interpreting Rule 15(c)(1)(C) "strictly." *Brown*, 517 F. App'x at 435. This understanding of the rule prevents "eleventh-hour lawsuits with placeholder defendants designed to frustrate the operation of a statute of limitations." *Brown*, 517 F. App'x at 435 (citing *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996)). More specifically, a mistake is *not* replacing a John Doe defendant with the party's name. *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) (citing *Cox*, 75 F.3d at 240). Rule 15(c) does not offer a remedy for situations where plaintiffs wait until the last day to file and do not leave any time to identify defendants within the relevant times. *Smith*, 476 F. App'x at 69 ("The Rule allows relations back for the mistaken identification of defendants, not for defendants to be named later through 'John Doe,' 'Unnamed Defendants' or other missing appellations.").

No mistake exists here: Plaintiff's action is the type of litigation that *Smith*, *Brown*, and *Cox* addressed and desired to prevent. Plaintiff filed his complaint at the "eleventh-hour" of the claims' statute of limitations and used "Unnamed Nurses and/or Unnamed Correctional Officers" as placeholders. Now, Plaintiff is attempting to use Rule 15(c) as a remedy for his statute of limitations problems caused by his last-minute filing. Rule 15(c) cannot be used to circumvent statutes of limitations in this manner. *See Cox*, 75 F.3d at 240. Adding Defendant Mirolovich to replace "Unnamed Nurses and/or Unnamed Correctional Officers" via the First Amended

Complaint is not the result of a Rule 15(c) mistake.

Because neither notice (Rule 15(c)(1)(C)(i)) nor mistake (Rule 15(c)(1)(C)(ii)) existed, the First Amended Complaint does not relate back to the original Complaint's filing date. Thus, for statue of limitations purposes, the filing date for Defendant Mirolovich is April 5, 2016. This April 5 filing date is considerably past the two-year time period which accrued on May 13, 2013. As a result, the § 1983 claim against Defendant Mirolovich is barred by statute of limitations.

### 4. Equitable Tolling

Plaintiff does not expressly argue for equitable tolling in such terms, but, out of an abundance of caution, the Court addresses Plaintiff's argument concerning discovery delays as an argument for equitable tolling.

"[T]he doctrine of equitable tolling is used sparingly by federal courts." *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). Equitable tolling has two requirements: (1) "petitioner must establish 'that he has been pursuing his rights diligently.' And [(2)], the petitioner must show 'that some extraordinary circumstance stood in his way and prevented timely filing.'" *Hall v. Warden, Labanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2012) (quoting *Holland v. Florida*, 560 U.S. 631, 632 (2010)); *accord Credit Suisse Securities (USA) v. Simmonds*, 566 U.S. 221, 226–27 (2012) (discussing long-settled equitable-tolling principles).

Assuming, *arguendo*, that Plaintiff pursued his rights diligently, the Court finds that Plaintiff has not shown an extraordinary circumstance that prevented him from timely filing. Plaintiff filed the original Complaint on May 12, 2015—the day before he believed the statute of limitations expired. Furthermore, the discovery delays which Plaintiff argues made naming Defendant Mirolovich "not possible," Pl.'s Opp'n at 30, are immaterial because the delayed

-18-

discovery was not directed toward identifying Defendant Mirolovich. Specifically, Plaintiff's Motion to Compel focused upon acquiring jail records, such as phone calls and manuals. Pl.'s M. to Compel 2, Doc #: 19. However, the motion acknowledged that Plaintiff had already received Plaintiff's medical records from the Jail and hospital, such as the Progress Notes written by Defendant Mirolovich. *Id*. The Plaintiff's Jail medical records, which counsel had, were sufficient to identify Defendant Mirolovich; the additional records requested were not necessary to do so. As a result, any discovery delays did not prevent the identification of Defendant Mirolovich and, consequently, do not warrant tolling. Ultimately, Plaintiff waited until the "eleventh-hour" to file his claim and gives no reason for this last-minute filing—let alone an extraordinary one as equitable tolling requires.

Additionally, Plaintiff argues that he has satisfied the Ohio Rules of Civil Procedure for the First Amended Complaint to relate back to the original Complaint. Pl.'s Opp'n at 30. As an initial matter, the Court is highly skeptical that the Ohio Rules of Civil Procedure are applicable to the matter at hand. In *Smith*, for example, the plaintiff argued that "because he filed his original complaint in Ohio and because Ohio has more permissible John Doe pleading standards, he should be permitted to correct the complaint after the expiration of the two-year limitations period." 476 F. App'x at 70. The Court responded that "[e]ven if we were willing to accept this doubtful theory, it offers no aid to [Plaintiff]. As it turns out, he did not satisfy Ohio's John Doe pleading standards either." *Id.* To avoid possible inequity, the Court considers whether Plaintiff has met Ohio standards. Ohio's rules allow a plaintiff to designate an unknown defendant by any name and description, but the plaintiff must aver in the original complaint that he could not discover the unknown name and then identify and serve the defendant. Ohio Civ. R. 15(D).

-19-

Plaintiff claims that "[t]he original Complaint avers that [Defendant Mirolovich's] name could not be discovered in calling him an 'unnamed Nurse. . . ." Pl.'s Opp'n at 29. Plaintiff did not provide a citation to this averment nor can the Court find this averment anywhere in the original Complaint. Thus, Plaintiff has not satisfied the Ohio standards.

In short, by filing his original Complaint on the last day against "Unnamed Nurses and/or Unnamed Correctional Officers," Plaintiff has done exactly the type of "John Doe" pleading not permitted by cases in the Sixth Circuit. The First Amended Complaint does not relate back to the original Complaint, so the filing of claims against Defendant Mirolovich is outside the two-year statute of limitations and, therefore, barred.

### C. The Merits of the § 1983 Claim

Since the parties have addressed the merits of the claims against Defendant Mirolovich, the Court will briefly discuss them.

### 1. Deliberate Indifference to a Serious Medical Need Framework

"A prisoner has adequately stated a cause of action [for deliberate indifference to serious medical needs] 'when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury.'" *Scott*, 557 F.3d at 648 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)); *see also Watson v. McClain*, No. 3:14-CV-0132, 2014 WL 4715677, at *3, 2014 U.S. Dist. LEXIS 133602, at *6 (N.D. Ohio Sept. 22, 2014) ("Only deliberate indifference to serious medical needs or extreme deprivations regarding the conditions of confinement will implicate the protections of the Eight Amendment.").

> The inquiry into whether a prison official acted with deliberate indifference has both an objective and subjective component. In order to satisfy the objective component, the prisoner must show that the medical need is "sufficiently serious." To satisfy the subjective component, the prisoner must allege facts which show that the prison official had a "sufficiently culpable state of mind." It must be shown that the official acted with reckless disregard for a substantial risk to the prisoner, that he drew the inference, and that he disregarded the risk.

*Scott*, 577 F.3d at 648 (citations omitted).

### i. "Sufficiently Serious" Medical Need

To evaluate whether a serious medical need exists, the Sixth Circuit uses an "obviousness" approach. *See Watson*, 2014 WL 4715677, at *3 (citing *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). Under this standard, a line exists distinguishing minor illnesses that require treatment for "convenience or comfort" such as colds, headaches, etc. from "serious medical needs which may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" *Watson*, 2014 WL 4715677, at *3 (quoting *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991)).

### ii. "Sufficiently Culpable State of Mind"

To constitute deliberate indifference, the defendant must have had a sufficiently culpable state of mind in denying medical care, entailing something "more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994). Therefore, the standard is met if the defendant knew of an excessive risk to health and disregarded that risk. *See Farmer*, 511 U.S. at 835; *see also*

-21-

*Watson*, 2014 WL 4715677, at *4. In other words, "[i]t must be shown that the official acted with reckless disregard for a substantial risk to the prisoner, that he drew the inference, and that he disregarded the risk." *Scott*, 577 F.3d at 648.

Considering recklessness in the context of medicine, courts are hesitant to find that differences in medical judgment amount to recklessness. "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper form is the state court . . . ." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims that sound in state tort law." *Westlake*, 537 F.2d at 860 n.5. However, cases do exist where the medical attention is so inadequate as to amount to no treatment at all. *E.g.*, *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970) (holding that an allegation that the warden refused to authorize diabetes medication needed to prevent serious injury could be treatment so insufficient as to amount to no treatment at all).

### 2. Defendant Mirolovich's Alleged Deliberate Indifference

As mentioned, a § 1983 claim has two prongs: an objective and a subjective prong. The Court will discuss the subjective prong first. Here, Plaintiff makes several arguments of how Defendant Mirolovich was deliberately indifferent to Plaintiff's serious medical need.

#### i. Medical Judgments

The first three instances Defendant Mirolovich claims show deliberate indifference are: (1) Defendant Mirolovich's physical examination of Plaintiff, (2) Defendant Mirolovich's failure to review Plaintiff's medical history, and (3) Defendant Mirolovich's failure to follow-up on the

-22-

blood tests and urinalysis. In each of these instances, Defendant Mirolovich exercised his medical judgment. Viewed in hindsight with knowledge of the cause of Plaintiff's symptoms, Defendant Mirolovich's decisions may have been incorrect; however, none of these decisions or actions rise to the level of recklessness required for deliberate indifference because Defendant Mirolovich did not have a sufficiently culpable state of mind in denying medical care.

Plaintiff argues that Defendant Mirolovich should have reviewed Plaintiff's medical history. The parties do not dispute that Defendant did not review Plaintiff medical history. Defendant only reviewed "the medical history that [he] obtained from [Plaintiff] in the course of the visit." Mirolovich Dep. at 98:22–23. Defendant Mirolovich believed that having or knowing a patient's medical history during an examination is not always necessary but rather,

> [If I do not have the medical history at the exam,] I ask the patient regarding his history and the issue becomes what does the patient divulge.
> . . .
> The patient is the one who is presenting and the patient is the one who is responsible for providing, not at the level of a physician. I don't think any of us goes to a physician with a diagnosis. We go with presenting complaints, as [Plaintiff] did. And the complaints that [Plaintiff] had were ones which were documented here and he had no other symptoms.

Defendant Mirolovich made a medical judgment to not look at Plaintiff's medical history but, instead, to rely on his conversation with Plaintiff. At worst, Defendant Mirolovich's failure to review medical history may rise to the level of negligence. *See Little v. Corr. Corp. of Am,*, 103 Fed.Appx. 898, 900 (6th Cir. 2004) (finding that the jail director's failure to follow-up on the medical history he received from the plaintiff's mother was only negligence). Hypothetically, if Defendant Mirolovich had reviewed the medical history, he would have seen Plaintiff's intravenous drug history and might have suspected that Plaintiff had endocarnitis. But Plaintiff's

-23-

symptoms and what Plaintiff recounted to Defendant Mirolovich did not make Plaintiff's life-threatening condition obvious. The evidence does not show that Defendant Mirolovich had a subjective knowledge of this serious medical condition and, therefore, acted recklessly.

In the examination, Defendant Mirolovich addressed both of Plaintiff's two stated reasons for the May 8 visit, prescribed ibuprofen, and ordered blood test and urinalysis. Dr. Mendel, Plaintiff's expert, opines that the evaluation was not adequate. Dr. Mendel's Updated Conclusions (Opp'n to M. to Strike, Ex. 1) 5, Doc #: 66-1 ("When [Plaintiff] was finally seen, the medical evaluation was inadequate."). Dr. Mendel found that Defendant Mirolovich's evaluation was "grossly inadequate" because, while Defendant Mirolovich noted some findings, he made no specific diagnosis. *Id.* at 7. Since Defendant Mirolovich could not make a clear diagnosis, Dr. Mendel asserts that Defendant Mirolovich should have made provisions to reevaluate or monitor Plaintiff's condition. *Id.* However, as Sixth Circuit case law makes clear, these alleged deficiencies in Defendant Mirolovich's evaluation only rise to negligence. Moreover, by ordering two tests, Defendant Mirolovich did provide for reevaluation and monitoring. *See* Progress Notes. This dispute merely concerns the adequacy of the follow up and, thus, does not rise to a constitutional claim. *See Estelle*, 429 U.S. at 97.

Last, Plaintiff argues that Defendant Mirolovich should have followed-up with the blood test and urinalysis that he ordered for Plaintiff. The record is unclear as to what happened to these ordered tests. Defendant Mirolovich ordered the tests and then relied on the other medical staff to carry out his orders. Mirolovich Dep. at 72:2–3. Once again, no evidence on the record exists that shows Defendant Mirolovich knew of a serious medical risk to Plaintiff and intentionally or recklessly disregarded that risk by not following-up with the ordered tests. Assuming that

-24-

Defendant Mirolovich did have some duty to follow-up on the tests, such a breach still only rises to the level of negligence.

### ii. Trustee Status Revocation

Fourth, Plaintiff alleges that Defendant Mirolovich's revoking of Plaintiff's trustee status is evidence that Defendant Mirolovich knew Plaintiff's medical condition was serious. Dr. Mendel's Updated Conclusions at 4 ("[Defendant Mirolovich's] signature to revoke the [trustee] status was an indication that [Plaintiff] had an ongoing medical issue that had not resolved and was of sufficient severity that [Plaintiff] could not work."). Defendant Mirolovich states that he signed the form to revoke Plaintiff's trustee status as a matter of practice explaining, "[o]rders such as this were often placed in a pile and whatever provider was free, took those orders and went through them." Mirolovich Dep. at 119:11–13. Defendant Mirolovich went on to explain that the medical staff would fill out the revocation forms for him to sign based on certain jail protocols. Mirolovich Dep. at 119:21–120:7. The content and nature of these protocols is unclear, but Defendant Mirolovich attests in his deposition that he, in essence, blindly signed the revocation forms that the medical staff put in front of him. No evidence in the record suggests that Defendant Mirolovich's signing the specific form revoking Plaintiff's trustee status involved anything more than the standard signature-without-inquiry. Furthermore, the form itself says nothing about a life-threatening medical condition; so, even if Defendant Mirolovich read the form before signing, he would not have had the requisite knowledge for a constitutional violation.

Construing the ambiguities in the light most favorable to Plaintiff, Defendant Mirolovich could, at worst, be considered negligent. No evidence exists in the record showing that Defendant

Mirolovich acted with a sufficiently culpable state of mind or with reckless disregard. Because the evidence does not satisfy the subjective prong of the § 1983 analysis, the Court need not discuss the objective prong and declines to do so. In sum, the evidence does not support a finding that Defendant Mirolovich violated Plaintiff's constitutional rights through deliberate indifference to a serious medical need.

### 3. The State Claims

To overcome immunity, Plaintiff must demonstrate that the alleged action was "committed 'with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (quoting Ohio Rev. Code § 2744.03(A)(6)(b)). As discussed above, Defendant Mirolovich acted with, at most, negligence. Consequently, there is no evidence that Defendant Mirolovich acted with the intent necessary to overcome immunity.

Also, the evidence does not support claims against Defendant Mirolovich of willful, wanton, reckless, and negligent conduct. The Ohio Supreme Court defines wilful misconduct as "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Tighe v. Diamond*, 80 N.E. 122, 127 (Ohio 1948). The Ohio Supreme Court describes wanton as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). Finally, the Ohio Supreme Court defines recklessness as a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* For the reasons stated above in relation to

Plaintiff's § 1983 claim, the Court finds that Defendant Mirolovich was neither willful, wanton, nor reckless in his actions toward plaintiff (and, as already discussed, mere negligence is insufficient, *see Ward*, 721 F. Supp. 2d at 694); therefore, the state law claims against him must also be denied.

**V. Conclusion**

Because Plaintiff failed to file within the statute of limitations, his claims against Defendant Mirolovich must be dimissed. Furthermore, these claims fail to demonstrate a constitutional violation or willful, wanton, reckless, and negligent disregard. Therefore, Defendant Mirolovich's Motion for Summary Judgment, Doc #: 59, is GRANTED in part. All claims against Defendant Mirolovich in his individual capacity are DISMISSED with prejudice. Ruling on the claim against Defendant Mirolovich in his official capacity is DEFERRED.

IT IS SO ORDERED.

*/s/ Dan A. Polster    July 19, 2017*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**