**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CAMERON NORTH,** | ) | **CASE NO. 1:15-cv-01124-DAP** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **vs.** | ) | <u>**OPINION AND ORDER**</u> |
| | ) | |
| **COUNTY OF CUYAHOGA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## I. Background

On May 13, 2013, Cameron North (Plaintiff) was an inmate at the Cuyahoga County

Correctional Center (the Jail) and suffered a stroke rendering him permanently disabled. Compl.,

¶ 1, Doc #: 1-1. Plaintiff filed the Complaint in Cuyahoga County Common Pleas Court on filed

May 12, 2015, alleging federal and state law claims pertaining to his medical care at the Jail. Doc

#: 1-1. Defendants Cuyahoga County, et al. filed a Notice of Removal to this Court on June 3,

2015. Doc #: 1-2. Defendants then filed an Answer on November 25, 2015. Doc #: 11.

On April 5, 2016, Plaintiff filed his First Amended Complaint adding new party

defendants Father Mirolovich, M. Elhalaby, C. Clack, and S. Hester in place of previously

described "Unnamed Nurses and/or Unnamed Correctional Officers." *Compare* Compl. ¶¶ 8–10

*with* First Am. Compl., ¶¶ 14–17, Doc #: 21. The First Amended Complaint contained four claims: a 42 U.S.C. § 1983 claim against the individual defendants for deliberate indifference to Plaintiff's serious medical needs; a 42 U.S.C. § 1983 claim against Cuyahoga County for failure to adequately train, supervise, screen, test, and discipline the Jail and for failure to institute adequate policies and procedures; a state law claim of willful, wanton, reckless, and negligent conduct; and a state law claim of negligence. ¶¶ 76–88. Defendant Father Mirolovich filed his Answer to the First Amended Complaint on July 15, 2016. Doc #: 36. Shortly after, Defendants Cuyahoga County, Clack, Elhalaby, and Hester (collectively, County Defendants) filed their Answer to the First Amended Complaint. Doc #: 39.

Defendant Cuyahoga County filed Motions to Dismiss both the Complaint and the First Amended Complaint, and Defendants Elhalaby, Hester, and Clack filed a Motion to Dismiss the First Amended Complaint; all three motions were based in part on statute of limitations grounds. Doc ##: 5, 22, 33. In each Order denying those motions, the Court indicated that it may consider statute of limitations arguments in later filings because the statute of limitations issue may turn on questions of fact resolved during discovery. Doc ##: 9, 29, 40.

On May 5, 2017, Defendant Father Mirolovich filed a Motion for Summary Judgment, and the County Defendants collectively filed a separate Motion for Summary Judgment. Doc ##: 59, 64. On June 14, 2017, Plaintiff filed and the Court granted Plaintiff's voluntary motion to dismiss County Defendants Elhalaby and Hester without prejudice. Doc #: 74. On July 19, 2017, the Court granted Defendant Father Mirolovich's Motion in part, dismissing Defendant Father Mirolovich in his individual capacity but deferring ruling on Defendant Father Mirolovich in his official capacity until the County Defendants' motion was ready to be decided. Doc #: 78.

The County Defendants' Motion (relevant only to Defendants Cuyahoga County and Clack since the dismissal of Defendants Elhalaby and Hester) became ripe on July 22, 2017. This Order follows.

## II. Summary Judgment Framework

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "On the other hand, if a reasonable jury could return a verdict for the nonmoving party, summary judgment for the moving party is inappropriate." *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant bears the initial burden of showing that there is no material issue in dispute. *Id*. at 607 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "A fact is deemed material only if it might affect the outcome of the lawsuit under the governing substantive law." *Id*. (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)). In reviewing a motion for summary judgment, the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Id*. (citing *Kalamazoo Acquisitions, LLC v. Westfield Ins. Co*., 395 F.3d 338, 342 (6th Cir. 2005)).

## III. Factual Background

Plaintiff entered the Jail in February 2013. C. North Dep., Oct. 19, 2016, 37:21–24, Doc #: 56-1. Shortly after arriving, Plaintiff became a "trustee," which entailed working in the kitchen and also having various privileges such as more desirable living accommodations. *Id.* at

-3-

38:1–39:17.

During a phone call with his mother in the morning of March 27, 2013, Plaintiff mentioned that a correctional officer (CO) had accused him of being lazy during his duties in the kitchen and that, on his way back from the kitchen, he explained to a different CO that he was not lazy but that he "pulled a muscle in [his] arm." Jail Call between C. North and E. North on March 27, 2013 (Disc 2 J400, 3R1G20ZM) 0:52–01:29, Doc #: 64-1. Plaintiff said he believed that the CO reported Plaintiff's injury to the Jail's medical unit as a result of his comments on his way back from the kitchen. *Id.* at 01:20-01:32.

Later that day, Plaintiff went to the medical unit and was seen by Defendant Nurse Clack. During their depositions, neither Plaintiff nor Defendant Clack remembered their interaction with each other that day. C. North Dep. 44:16–45:11; Clack Dep., Nov. 1, 2016, 95:23–25, Doc #: 60. The only evidence of Plaintiff's visit to the medical unit on March 27 is the refusal of care form (Refusal Form). *See* Refusal of Medical Treatment (Shobert Dep. 372), Doc #: 72-7. When an inmate refuses treatment, the Jail's Policy and Procedure Standard Form (Jail Manual) states that the refusal of care form should include: (1) "a description of the service being refused," (2) "adverse consequences that may result as a result of the refusal," (3) "the signature of the inmate," and (4) "the signature of the health services staff member as a witness;" and, if the inmate refuses to sign, another medical staff must sign as a second witness. Jail Medical Policies, 145–46, Doc #: 72-8.

The Refusal Form states,

> I, the above named inmate, certify that I am refusing medical care (treatment or procedure) at the Cuyahoga County Corrections Center. I have been counseled and informed of the consequences of this refusal. I understand I am

-4-

> acting against the advice of the Physician. The medical risks/benefits have been explained to me by a member of the medical staff and I understand those risks. I hereby release all Personnel, Doctors, Medical Personnel and Administration of the Cuyahoga County Sheriff's Department and Health Care Services from all responsibility for all consequences.

Refusal of Medical Treatment ("medical care" is handwritten on a line in the form). Handwritten in the space for "[r]eason for refusal of treatment/procedure," is "'arm hurt earlier—better now,'" in quotations. *Id.* Below that, the checklist labeled "Medical Risks"—which includes lines for "Death," "Additional pain and/or suffering," "Risks to unborn fetus," "Permanent disability/disfigurement, "and "Other"—was left blank. *Id.* The Refusal Form contains three signatures. Defendant Clack signed on the line designated for the "Health Services staff signature." Clack Dep. 95:16–22; Refusal of Medical Treatment. Plaintiff signed on the line designated for the inmate. C. North Dep. 45:2–5; Refusal of Medical Treatment. Finally, Defendant Clack stated that she believed Vaughn Perry, a medical staff person, signed on the line designated for "Witness signature." Clack Dep. 95:23–25; Refusal of Medical Treatment.

Two days later, on March 29, Plaintiff complained to his grandmother that his right thumb hurt and that he had been waking up sweating. Jail Call between C. North and M. Palumbo on March 29, 2013 (Disc 1 J400, 3T1G200Z) 12:09–12:38, 17:29-17:41. On April 2, Plaintiff again mentioned to his grandmother that his hand was swollen, but he said he did not want to report his medical condition for fear of losing his trustee position. Jail Call between C. North and M. Plumbo on April 2, 2013 (Disc 1 J400, 421G2047) 00:43–01:18. He assured his grandmother that he would report his condition if it worsened. *Id.* at 01:30–01:40.

Plaintiff recalled experiencing pain in his side and a bump on his hand by late April or early May. C. North Dep. 42:5–43:9. During a phone call on May 7, he described having pain

down his right side which he was medicating with ibuprofen.[1] Jail Call between C. North and M. Plumbo on May 7, 2013 (Disc 1 J400, 571G2007) 01:10–01:30.

On May 8, Plaintiff returned to the medical unit because of his pain. Progress Notes (Butler Dep. 100), Doc #: 72-1. The record is subject to dispute concerning what brought Plaintiff into the medical unit that day. The record supports at least three alternatives. First, Plaintiff could have gone because his mother called the prison concerning his medical condition. Cuyahoga Cty. Corr. Ctr. Med. Concerns (Shobert Dep. 373), Doc #: 72-7. Plaintiff's mother first called the Jail and talked to Sgt. Christopher who forwarded her call to Sandra Hammond in the Warden's Office so that Plaintiff's mother could create a "medical concern notice." Christopher Report (Ex. 4), Doc #: 72-9. Sgt. Christopher explained in his deposition that, from there, someone in the Warden's Office would typically complete the medical concern notice and then email that notice to a designated person in the medical unit. Christopher Dep., Nov. 1, 2016, 73:5–15, Doc #: 58-1. This first possibility is supported by Plaintiff's May 8 medical records which begin with the words "Warden concern:"—possibly referring to the medical concern notice from the Warden's Office. Progress Notes. Second, Plaintiff could have gone because he previously completed a "kite" requesting medical attention. C. North Dep. 85:20–86:2. However, Plaintiff's expert witness testified that, if a kite existed, it should have been in Plaintiff's medical records and that he could not find any evidence in Plaintiff's medical records that Plaintiff had ever submitted a kite. Mendel Dep., April 24, 2017, 59:2–60:1, Doc #: 72-12. Third, Plaintiff could have gone because he complained to various COs about his pain. C. North Dep. 87:6–13.

Regardless of how Plaintiff got to the medical unit, once there, a member of the medical

---

[1]The record does not describe how he got this ibuprofen.

-6-

staff recorded Plaintiff's vital signs and reason for Plaintiff's visit: "Warden concern: [patient complains of] neck and upper [left] shoulder and lower abdominal under rib pain." Progress Notes. This unnamed medical staff person indicated the conclusion of his or her notes with a signature. *Id*. The signature on the Progress Note is illegible, and no party has identified this staff member's name in their briefings.

Following the preliminary notes and vital signs, Father Mirolovich, the attending nurse practitioner, began his evaluation and his portion of the progress notes. Elhalaby Dep., Oct. 25, 2016, 28:14–16, Doc #: 61-1. Father Mirolovich did not review Plaintiff's medical records on May 8. Mirolovich Dep., Nov. 22, 2016, 98:20–99:10, Doc #: 55-1. Father Mirolovich only reviewed "the medical history that [he] obtained from [Plaintiff] in the course of the visit." *Id.* at 98:22–23. In Father Mirolovich's section of the medical notes, he wrote that Plaintiff reported "a 2-day [history] of [left] lateral neck pain associated [with left upper quadrant] pain [with] deep inspirations." Progress Notes; *accord* Mirolovich Dep. 101:6–9. Father Mirolovich also noted that Plaintiff denied any trauma and denied any other symptoms. Progress Notes; *accord* Mirolovich Dep. 102:6.

In assessing Plaintiff, Father Mirolovich addressed the lower abdominal pain as "undifferentiated abdominal pain." Progress Notes; Mirolovich Dep. 106:1–2. In response to Plaintiff's shoulder plain, Father Mirolovich wrote that he could not find point tenderness anywhere on the shoulder but also noted that the shoulder pain might be from another part of the body and not from the shoulder. Progress Notes; Mirolovich Dep. 106:2–10. In his deposition, Father Mirolovich explained that problems such as inflammation of the gallbladder could result in shoulder pain. Mirolovich Dep. 106:13–23.

As a result of the examination, Father Mirolovich ordered blood tests to be taken the next morning. Physician's Order Form (Butler Dep. 101), Doc #: 72-1; Mirolovich Dep. 107:7–12. He also ordered 400mg of ibuprofen to be taken as needed. *Id.* Defendant Clack's signature appears at the bottom of the Physician's Order Form (Order Form) indicating that she "signed off the orders." Physician's Order Form; Clack Dep., 101:18–22. Generally, for orders in the Jail, a provider would write an order and place it in an inbox. Clack Dep. 64:18–20; Collingwood Dep. 48:16–20. Then, a nurse would collect the orders from the inbox and create a lab requisition for each order. Clack Dep. 64:20–21; Collingwood Dep. 48:21–25. The nurse would then leave the lab requisitions in an inbox in the lab office. Clack Dep. 64:21–22; Collingwood Dep. 49:14–17. From there, a lab nurse or medical technician assistance (MTA) would generate a list of lab requisitions and would give that list to a CO so that the inmates could be brought to the medical unit. Clack Dep. 66:7–11.

While reviewing the Order Form during her deposition, Defendant Clack denied remembering this Order Form specifically but described what she likely did with Mirolovich's orders pertaining to North:

> I would have gone order by order. I would see that [Mirolovich] wrote in-house UA done, and when he writes done that it was finished. The labs for the morning and the Ibuprofen for pain. I would have put the Ibuprofen on a medication record. The labs I would have initiated a lab requisition and it would have gone into the lab. And then I will sign it off and put the copy into the pharmacy and the original into the chart.

Clack Dep. 101:23–102:12.

On the Order Form, Father Mirolovich also wrote "in-house [urinalysis] done." However, after being ordered by Father Mirolovich, no evidence of the urinalysis exists in the record, and

-8-

what "done" meant in the context of this order is unclear. Defendant Clack interpreted "done" to mean that the urinalysis had been *completed*. In her deposition, she explained that she understood Father Mirolovich writing "in-house UA done" to mean that the urinalysis was finished, that Father Mirolovich had looked at the results and "wanted to document that it was done." Clack Dep., Nov. 1, 2016, 101:25–103:8. Dr. Mendel, a medical expert Plaintiff retained to review his medical care in this case, agreed with Clack and stated in his report that he understood the Order Form to indicate that the urinalysis was complete; however, he noted, the record does not contain the results of that test. Mendel Dep., April 24, 2017, 113:12–20.

In contrast, in Father Mirolovich's deposition, he explained that "done" meant that the urine sample had been *obtained*:

> Q:    The urinalysis that is done in the jail is done in-house; right?
> **A:    Yes, it is.**
> **      What do you mean by done?**
> **      Obtained?**
> Q:    The urine is obtained?
> **A:    It's obtained, yes.**
> Q:    And what happens to the urine?
> **A:    It's sent to the hospital.**

Mirolovich Dep. 73:4–12. Father Mirolovich explained in his deposition that his notes indicate that the medical staff had obtained Plaintiff's urine but that the sample still needed to be sent to the hospital. Mirolovich Dep. 73:4–16. Plaintiff could not recall whether he had given a urine sample for this urinalysis. C. North Dep. 80:4–8.

According to depositions of various medical staff at the Jail results from blood tests and urinalyses were typically available anywhere from a few hours to a few days. *See e.g.,* Elhalaby Dep. 51:20–52:19, 55:25–57:5 (stating that the medical staff could get lab results within a few

hours when necessary); Ruzicka Dep., Jan. 13, 2017, 61:2–7, Doc #: 57-1 (stating that blood test

results were usually available within 24 hours but that it could take longer over weekends); Clack

Dep. 72:4–12 (stating that the turnaround for the urinalysis is about two days); Collingwood

Dep., Dec. 22, 2016, 54:3–9, Doc #: 72-5 (stating that blood work could be done in a few days);

Collingwood Dep. 95:18–22 (stating that urinalysis results could be attained immediately if

necessary).

      The next day, May 9, Plaintiff's mother called the jail again, and Sgt. Christopher advised

her to submit another medical concern form with the Warden's Office. Christopher Report.

Christopher's report notes that he informed Nurse Ruzicka of the call; however, Ruzicka does

not recall receiving any verbal or written complaints on that day. Ruzicka Dep. 86:2–5.

      The blood Father Mirolovich ordered for the blood tests was never drawn. No evidence

exists in the record that anyone attempted to take Plaintiff's blood on May 9 or at any other time.

There is evidence that Plaintiff tried to refuse the blood test. In a phone call with his mother on

May 10, Plaintiff explained that he tried to refuse the blood tests, saying,

> I tried getting out of it. I tried telling her, you know, I want to sign against
> medical advice. I don't want blood work. I feel fine. The pain went away.
> And the CO in the kitchen was standing right there and she said. . . . She
> said, well, if it didn't hurt that bad, you wouldn't have called complaining
> to your mom.

Transcript of Telephone Conversation Between Cameron North and Elizabeth North

(5A1G20Q6), 6:14–23, Doc #: 64-3; Jail Call between C. North and E. North on May 10, 2013

(Disc 1 J400, 5A1G20Q6) 05:29–05:48. However, during Plaintiff's deposition, he was asked,

"Isn't it true that you were set to go for labs and then you refused to go?" Plaintiff responded,

"No. That is absolutely wrong."[2] Cameron North Dep. 55:4–8. Plaintiff testified that, after his appointment with Father Mirolovich, Plaintiff reminded COs that he was supposed to get blood drawn. *Id*. at 96:21–97:7. Plaintiff could not recall how many times he mentioned this to his COs but knew that it was multiple times since the COs started to "joke" with Plaintiff that he would be moved from his trustee pod to a gang pod. *Id.* at 98:11–23.

On May 10, Father Mirolovich revoked Plaintiff's trustee status. Physician's Order Form (Butler Dep. 102), Doc #: 72-1. CO Butler allowed Plaintiff to stay in the trustee pod. Butler Dep., Dec. 12, 2016, 45:17-22. However, Plaintiff knew, now that his trustee status was revoked, he could be moved to a less desirable pod at any moment. Jail Call between Cameron North and Elizabeth North on May 12, 2013 (Disc 1 J400, 5C1G20R7) 15:20–15:37. Starting on May 10, when Father Mirolovich revoked Plaintiff's trustee status, the Jail's log book consistently stated—on May 10, 11, and 12—that Plaintiff could not work until cleared by the medical staff. Official Log Book (Ex. 5) 3–6, Doc #: 72-13.

Plaintiff said he believed that his trustee status revocation and reclassification to a less desirable pod were the results of his mother calling the jail, and he urged her to stop calling the Jail about his medical condition. *See* Transcript of Telephone Conversation Between Cameron North and Elizabeth North (5A1G20Q6, Ex. C) 2:3-13; *see also* Jail Call between C. North and E. North on May 10, 2013 (Disc 1 J400, 5A1G20Q6) 0:18–0:38; *see also* Telephone Conversation Between Cameron North and Elizabeth North (5C1G20R7, Ex. D) 19:1–2, Doc #: 64-3; *see also* Jail Call between C. North and E. North on May 12, 2013 (Disc 1 J400,

---

[2]Because Plaintiff was responding to a compound question, it is not clear what he was denying.

5C1G20R7) 13:49–14:11.

On May 13, Plaintiff suffered a stroke. The precise timing of events that day is unclear, but three sources help explain that day's events: Plaintiff's testimony, medical records, and jail records.

Plaintiff remembers talking to his friend on the phone that day, and he next remembers being rolled down the Jail hallway in a wheelchair. C. North Dep. 56:12–57:25. Once he arrived at the medical unit, Plaintiff then recalls being asked asking a multitude of questions and medical staff accusing him of lying when they asked Plaintiff to raise both of his arms but he could only raise his right arm. C. North Dep. 58:7–15; 59:5–7.

Plaintiff's medical records also describe the events on May 13. Nurse Collingwood continued to update Plaintiff's medical notes throughout the event:

> 5/13/13 at 9:20 p.m. Medical Emergency; sitting on floor near phone; color pale; skin warm and dry; following simple commands; assisted to wheelchair, but inmate dragging [left] foot/leg [;therefore,]assisted to gurney and transported to dispensary [vital signs:] B/P 115/54 [heart rate] 58 [respiration] 16 SPO2, remains awake and alert–when asked what was wrong with him he stated "nothing nothing wrong," observing in dispensary. 9:45 [p.m.] Observed [moving][3] [left] arm and [left] leg on gurney. 9:50 [p.m.] summoned me over to say "I want to go back to the block;" continued to observe. 10 [p.m.] [vital signs:] 122/52 103 20; remaining alert, moving [right] arm to lift [left] arm; restless on gurney–[Collingwood's signature]

> 10:15 [p.m.] Examined by NP; EMS called [Collingwood's signature]

Progress notes (Butler Dep. 103), Doc #: 72-1; *see also* Collingwood Dep. 96:25–98:10.

Jail records also provide some details of that day. CO Diaz wrote that other inmates

---

[3]When reading her notes in her deposition, Collingwood read, "9:45, observed–I'm not sure exactly what that says–maybe moving left arm and left leg on gurney." Collingwood Dep. 98:1–3.

alerted of a possible medical emergency at 9:17 p.m. Combination Report (Collingwood Dep. Ex. 8) 1, Doc #: 72-3. On the following page of the report, the Floor/Area Supervisor's Review states that the medical emergency was secured at 9:31 p.m. and that Plaintiff was transported to Metro Hospital via EMS at 10:45 p.m. *Id* at 2.

Once at the hospital, doctors concluded that Plaintiff had suffered a stroke due to endocarditis. C. North Dep. 59:23–60:16. This endocarditis required open-heart surgery and subsequent therapy. *Id.* at 63:11–16, 61:21–62:3. As a result of the stroke, Plaintiff has lost some use of his left side. *Id.* at 64:21–65:13.

## IV. Discussion

### A. The Individual Defendant

The only remaining individual defendant is Nurse Catherine Clack. As discussed herein, the Court grants her Motion for Summary Judgment.

#### 1. Statute of Limitations

Defendant Clack contends that the claims against her are barred by the statute of limitations. To determine whether a claim is timely, the Court must determine the length of the statute of limitations, the date of accrual of the statute of limitations, and the effective date of filing.

##### a. Limitations Period and Date of Filing

Neither the length of the statute of limitations nor the effective date of filing is in dispute.

Plaintiff and the County Defendants agree that the relevant limitations period is two years. County Defs' Mot. for Summ. J. 4–5; Pl's Opp'n 27–28. The Court agrees and in fact has already held—when deciding Defendant Mirolovich's Motion for Summary Judgment—that the

applicable statutes of limitation are two years. Opinion and Order 12–14, Doc #: 78.

The end date, for statute of limitations purposes, is when the claim is filed. Here, Plaintiff filed the original Complaint in state court on May 12, 2015. Summons and Compl. 2. Although Defendant Clack was not named until the First Amended Complaint, which was filed on April 5, 2016, she has not argued that the Amended Complaint does not relate back to the original Complaint.[4] Accordingly, the Court concludes that for statue of limitations purposes, the filing date for all County Defendants is May 12, 2015.

### b. Accrual of the Statute of Limitations

The parties do dispute when the statute of limitations accrued. Defendant Clack argues that the statute of limitations period commenced on May 8, 2013, when Plaintiff was denied medical care. County Defs' Mot. for Summ. J. 4–5. On the other hand, Plaintiff counters that based on the discovery rule and the continuing violation doctrine, the statute of limitations period commenced for all claims on May 13, 2013, after he suffered the stroke. Pl's Opp'n 28.

For statute of limitations purposes, the time starts when the plaintiff knew or had reason to know of the injury that is the basis of the action. *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009) (citing *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005)). Having reason to know of the injury means that the plaintiff should have discovered the injury through exercising reasonable diligence. *Scott*, 577 F.3d at 646 (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). In a claim for deliberate indifference to serious medical needs, accrual is based not on discovery of medical *problems*, but rather on discovery of *indifference* to serious medical needs. *See Scott*,

---

[4]The Court earlier ruled that the Amended Complaint did not related back as to Defendant Mirolovich. Opinion and Order 14–18, Doc #: 78

577 F.3d at 646; *see also Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001).

However, in the event of a continuing violation, this rule is modified. The continuing violation doctrine, in relevant part, applies "where the plaintiff can show prior [wrongful] activity that continues into the present." *Bowerman v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 646 F.3d 360, 366 (6th Cir. 2011) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir.2003)). *But see Sharpe*, 319 F.3d at 267 (stating that the Sixth Circuit "employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions"). The continuing violation doctrine "allows the court to consider as timely all relevant violations including those that would otherwise be time [-]barred." *Bruce v. Corr. Med. Servs., Inc.*, 389 F. App'x 462, 466 (6th Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *National Parks Conservation Ass'n Inc. v. Tennessee Valley Authority*, 480 F.3d 410, 419 (6th Cir.2007)).

The continuing violation doctrine, however, does not apply to serial violations: series of discrete acts of which the plaintiff would have been immediately aware. *See Sharpe*, 319 F.3d at 268; *Bowerman*, 646 F.3d at 366. When discrete acts occur, "each discrete discriminatory act starts a new clock for filing charges alleging that act." *Bruce*, 389 F. App'x at 466 (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). For example, in *Bruce*, the inmate alleged that jail personnel denied him medical treatment and surgery for injuries he suffered while working at his prison job. *Id.* at 463, 466–67. Declining to apply the continuing violation doctrine, the Sixth Circuit held that "[a]ctual actions by [the defendant] of refusing medical care represent discrete unlawful acts (beyond passive inaction) that trigger the statute of limitations" and went on to hold that acts occurring before the statute of limitations were time

barred. *Id.* at 466–67.

Here, the record includes only two occasions on which Defendant Clack had any contact with Plaintiff or otherwise was involved with Plaintiff's medical case: during North's trip to the medical unit on March 27, 2013, and on May 8, 2013, when Defendant Clack signed Nurse Practitioner Mirolovich's orders for lab work that was never completed. Thus based on the available record, Defendant Clack's actions appear to be a series of related, yet discrete, offenses; each discrete offense thus starts its own new statute of limitations period. *See Bruce*, 389 F. App'x at 466–67; *see also* Order Denying Mot. to Dismiss 6, Doc #: 9 (concluding the continuing violation doctrine was inapplicable based on Plaintiff's Complaint). Accordingly, the Court does not apply the continuing violation doctrine but rather applies the general rule that each discrete act of indifference begins a new limitations period. The latest date on which the record describes action or inaction on the part of Defendant Clack is May 9, 2013, when her disregard of Plaintiff's medical need (i.e., when the lab work scheduled for the morning of May 9 was not completed) would have been plainly apparent because the morning of May 9 had come and gone without blood being drawn. Plaintiff's own deposition testimony confirms this analysis. He disputed the evidence that he had refused to have blood drawn, claiming that he told COs on multiple occasions that his blood was supposed to have been drawn.

Plaintiff, however, filed the instant case on May 12, 2015, several days after the two year period against Defendant Clack had run out. Therefore, Plaintiff's § 1983 claim against Defendant Clack is barred by the statute of limitations.

### 2. The Merits of the § 1983 Claim

Since the parties have addressed the merits of the claims against Defendant Clack, the

Court will briefly do so as well.

### a. Deliberate Indifference to a Serious Medical Need Framework

"A prisoner has adequately stated a cause of action [for deliberate indifference to serious medical needs] 'when he alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury.'" *Scott*, 557 F.3d at 648 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)); *see also Watson v. McClain*, No. 3:14-CV-0132, 2014 WL 4715677, at *3, 2014 U.S. Dist. LEXIS 133602, at *6 (N.D. Ohio Sept. 22, 2014) ("Only deliberate indifference to serious medical needs or extreme deprivations regarding the conditions of confinement will implicate the protections of the Eight Amendment.").

> The inquiry into whether a prison official acted with deliberate indifference has both an objective and subjective component. In order to satisfy the objective component, the prisoner must show that the medical need is "sufficiently serious." To satisfy the subjective component, the prisoner must allege facts which show that the prison official had a "sufficiently culpable state of mind." It must be shown that the official acted with reckless disregard for a substantial risk to the prisoner, that he drew the inference, and that he disregarded the risk.

*Scott*, 577 F.3d at 648 (citations omitted).

### i. "Sufficiently Serious" Medical Need

To evaluate whether a serious medical need exists, the Sixth Circuit uses an "obviousness" approach. *See Watson*, 2014 WL 4715677, at *3 (citing *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would

easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th

Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). Under this standard, a line exists distinguishing

minor illnesses that require treatment for "convenience or comfort" such as colds, headaches, etc.

from "serious medical needs which may be 'life threatening or pose[s] a risk of needless pain or

lingering disability if not treated at once.'" *Watson*, 2014 WL 4715677, at *3 (quoting *Davis v.*

*Jones*, 936 F.2d 971, 972 (7th Cir. 1991)).

### ii. "Sufficiently Culpable State of Mind"

To constitute deliberate indifference, the defendant must have had a sufficiently culpable

state of mind in denying medical care, entailing something "more than mere negligence." *Farmer*

*v. Brennan*, 511 U.S. 825, 834–35 (1994). Therefore, the standard is met if the defendant knew

of an excessive risk to health and disregarded that risk. *See Farmer*, 511 U.S. at 835; *see also*

*Watson*, 2014 WL 4715677, at *4. In other words, "[i]t must be shown that the official acted with

reckless disregard for a substantial risk to the prisoner, that he drew the inference, and that he

disregarded the risk." *Scott*, 577 F.3d at 648.

Considering recklessness in the context of medicine, courts are hesitant to find that

differences in medical judgment amount to recklessness. "A medical decision not to order an X-

ray, or like measures, does not represent cruel and unusual punishment. At most it is medical

malpractice, and as such the proper forum is the state court . . . ." *Estelle v. Gamble*, 429 U.S. 97,

107 (1976). "Where a prisoner has received some medical attention and the dispute is over the

adequacy of the treatment, federal courts are generally reluctant to second guess medical

judgment and to constitutionalize claims that sound in state tort law." *Westlake*, 537 F.2d at 860

n.5. However, cases do exist where the medical attention is so inadequate as to amount to no

treatment at all. *E.g.*, *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970) (holding that an allegation that the warden refused to authorize diabetes medication needed to prevent serious injury could be treatment so insufficient as to amount to no treatment at all).

### b. Defendant Clack's Alleged Deliberate Indifference

As mentioned, a § 1983 claim has two prongs: an objective and a subjective prong. The Court will discuss the subjective prong first. Here, North argues that two occasions demonstrate Clack's indifference. First, North argues that Defendant Clack was deliberately indifferent during North's trip to the medical unit on March 27, 2013. Second, North argues that Defendant Clack was deliberately indifferent on May 8 when she signed next to Mirolovich's orders.

### i. The Refusal of Care Form on March 27, 2013

Plaintiff argues two ways in which Defendant Clack was deliberately indifferent on March 27, 2013: Defendant Clack's omissions in executing the Refusal Form and Defendant Clack's qualifications for administering the Refusal Form.

First, relative to the alleged omissions by Defendant Clack, Plaintiff claims that Defendant Clack did not record a medical history or examine him to clarify his medical issues on March 27, 2013, and that she violated the informed consent policy by not explaining the consequences of his refusal. Pl's Opp'n 20. The very limited evidence in the record related to the events of March 27 does not support a conclusion that this is deliberate indifference. Plaintiff has not shown that Defendant Clack had a duty to perform the actions which Plaintiff alleges Defendant Clack omitted. The Jail Manual's section on refusal of care does not contain any requirements that a medical staff person record a medical history or examine an inmate before that inmate can refuse care. Furthermore, such a requirement would be impractical: why would a

patient consent to a physical examination and inquiry regarding his medical history when he is attempting to refuse medical evaluation?

Moreover, assuming Defendant Clack did have a duty and failed to perform that duty, her actions and omissions only rise to, at worst, negligence. Plaintiff saw Defendant Clack in the medical unit and refused care. Plaintiff had a very general complaint that his "arm hurt." A patient presenting with a symptom this general and minor, coupled with a stated desire to refuse care, has not manifested a serious medical need, one that is life threatening. Even if there was an informal, unwritten obligation to examine Plaintiff and record Plaintiff's medical history, Defendant Clack's failure to do so is not "deliberate indifference." No evidence suggests that Defendant Clack had, at any point, a sufficiently culpable state of mind in denying Plaintiff medical care. Therefore, Defendant Clack's actions and omissions at the time of refusal of care do not rise to the level of deliberate indifference.

Second, Plaintiff argues that Defendant Clack, a nurse, was unqualified to provide Plaintiff with the Refusal Form and, therefore, was deliberately indifferent for doing so. Pl's Opp'n 20. In support of this conclusion, Plaintiff cites both to Dr. Mendel's report and to the Jail Manual. Pl's Opp'n 20.

However, this evidence does not support the conclusion that Defendant Clack was unqualified to provide the Refusal Form. The Jail Manual contains various medical policy objectives of the Jail and brief descriptions of procedures to meet those objectives. The "Informed Consent and Right to Refuse" for invasive procedures section of the Jail Manual, which Plaintiff cites, does not specify any particular requirements for who may administer a Refusal Form, rather the Jail Manual only requires that "[p]rior to any invasive procedure,

whether for diagnostic or treatment purposes, the health care provider must explain the procedure

. . . .” and that a “health services staff member” must sign the form. Jail Medical Policies

145–146. The Jail Manual does not state that only a physician may administer a refusal of care

form. In other sections of the Jail Manual, specific roles and titles such as “physician” or

“provider” are used. *E.g.*, *Id.* at 89 (“A physician will see all inmates who return from the

emergency department or from a hospitalization at the earliest available appointment. If the

physician is not on site at the time an inmate returns, the health care services staff reviews the

discharge information and contacts the facility physician for orders as needed.”). In fact, later

within the Informed Consent section cited by Plaintiff, the Jail Manual states, “If treatment is

refused a second time, the physician will counsel the inmate.” *Id.* at 146. Clearly, as written, the

Jail Manual does not preclude a nurse such as Defendant Clack from administering a refusal of

care form.

Moreover, Dr. Mendel does not posit a concrete requirement of a specific level of

medical licensure for a staff member administering the Refusal Form. Instead, Dr. Mendel

concludes that Plaintiff’s specific medical condition disqualified Defendant Clack. Specifically,

Plaintiff cites a portion of Dr. Mendel’s report which states, “In light of the potential medical

conditions under consideration based on [Plaintiff’s] medical history, Nurse Clack was not

qualified to inform North about the potential risks of his decision to refuse medical evaluation on

March 27, 2013.” Mendel Updated Conclusions 2, Doc #: 72-11. However, there is no evidence

that Defendant Clack was aware of Plaintiff’s medical condition at the time of the administration

of the Refusal Form. In fact, in arguing for Defendant Clack’s indifference, Plaintiff explicitly

alleges that Defendant Clack did not review Plaintiff’s medical history or examine him. Thus,

-21-

even assuming that Plaintiff's medical condition would have disqualified Defendant Clack from administering the Refusal Form, her ignorance of Plaintiff's medical history and potential medical condition belie the conclusion that Defendant Clack "knew of an excessive risk to health and disregarded that risk."

In sum, there is no evidence that on March 27, 2013, Defendant Clack had the requisite culpability to make administration of the refusal form deliberately indifferent.

### ii. May 8, 2013, Medical Orders

Plaintiff also argues two reasons why on May 8, 2013, Defendant Clack was deliberately indifferent.

First, Plaintiff asserts that Defendant Clack was deliberately indifferent because the ordered blood test and urinalysis were never completed. Defendant Clack did sign the Order Form signifying that she had reviewed the orders and taken the proper steps to initiate them, but there is no evidence that the lab requisitions were ever completed or that any results from the urinalysis were produced. Pl's Opp'n at 21. Plaintiff also cites a nurse's deposition to say that completing ordered lab work is important and that not completing the lab work could pose a risk to the inmate. Pl's Opp'n at 21. Plaintiff argues that the lack of paperwork, such as a list of lab requisitions, evidences Defendant Clack's deliberately indifference: "[w]hether Clack placed Cameron [North] on the list to be called up for testing is unclear, but no record of any such list has been produced." Pl's Opp'n at 21.

However, at most, all Plaintiff has shown is that Defendant Clack was negligent in believing that the blood test and urinalyses had been completed. She did not know Plaintiff had a life threatening condition, and she did not deliberately refuse him any treatment. Furthermore,

-22-

Plaintiff's expert supports the conclusion Defendant Clack had done nothing wrong: he testified that he also interpreted Father Mirolovich's notation to mean the urinalysis had been done. Mendel Dep., April 24, 2017, 113–14. The chain of inferences required to leap from Defendant Clack's failure to complete paperwork properly to Defendant Clack recklessly or intentionally disregarding a serious risk to Plaintiff's health is too attenuated to survive summary judgment.

Second, Plaintiff argues that Defendant Clack was deliberately indifferent because she did not follow the Chest Pain Policy "mandated" in the Jail Manual. Plaintiff states that Defendant Clack knew Plaintiff suffered from chest pain on May 8 but did not initiate action pursuant to the Jail Manual guidelines. The Chest Pain Policy states the procedure of "evaluating inmates with chest pain" by first listing several risk factors and "documentation issues." Jail Medical Policies 165. Then, under "Nursing Alerts," the document states, "1. Presence of two or more risk factors. 2. Presence of cyanosis, diaphoresis, tachycardia, irregular pulse, syncope, hypotension, hypoxia, or nausea. **3. All cases of chest pain must be reported to the physician on duty.**" *Id.* However, this policy would not apply to Defendant Clack on May 8 because she was not "evaluating" Plaintiff, rather she merely signed off on the order subsequent to Nurse Practitioner Mirolovich examining Plaintiff. Accordingly, the Chest Pain Policy does not support a finding of deliberate indifference.

### ii. Objective Component

Construing the ambiguities in the light most favorable to Plaintiff, Defendant Clack could, at worst, be considered negligent. No evidence exists in the record showing that Defendant Clack acted with a sufficiently culpable state of mind or with reckless disregard. Because the evidence does not satisfy the subjective prong of the § 1983 analysis, the Court need not discuss

the objective prong and declines to do so. In sum, the evidence does not support a finding that

Defendant Clack violated Plaintiff's constitutional rights through deliberate indifference to a

serious medical need.

### 3. The State Claims

To overcome immunity, Plaintiff must demonstrate that the alleged action was

"committed 'with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Burgess*

*v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (quoting Ohio Rev. Code § 2744.03(A)(6)(b)). As

discussed above, Defendant Clack acted with, at most, negligence. Consequently, there is no

evidence that Defendant Clack acted with the intent necessary to overcome immunity.

Also, the evidence does not support claims against Defendant Clack of willful, wanton,

reckless, and negligent conduct. The Ohio Supreme Court defines wilful misconduct as "an

intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not

to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or

appreciation of the likelihood of resulting injury." *Tighe v. Diamond*, 80 N.E. 122, 127 (Ohio

1948). The Ohio Supreme Court describes wanton as "the failure to exercise any care toward

those to whom a duty of care is owed in circumstances in which there is a great probability that

harm will result." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). Finally, the Ohio

Supreme Court defines recklessness as a "conscious disregard of or indifference to a known or

obvious risk of harm to another that is unreasonable under the circumstances and is substantially

greater than negligent conduct." *Id.* For the reasons stated above in relation to Plaintiff's § 1983

claim, the Court finds that Defendant Clack was neither willful, wanton, nor reckless in her

actions toward plaintiff (and, as already discussed, mere negligence is insufficient, *see Ward*, 721

-24-

F. Supp. 2d at 694); therefore, the state law claims against her must also be denied.

**B. Institutional Defendant**

In addition to the claims against Defendant Clack in her individual capacity addressed above, Plaintiff also brings a § 1983 claim against Cuyahoga County in its own name, Defendant Clack in her official capacity, and Defendant Mirolovich in his official capacity. First Am. Compl. 4, 5, 14. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Because naming Defendant Mirolovich in his official capacity and Defendant Clack in her official capacity is equivalent to naming the county as a government entity, *Colely v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015), the Court found these three claims to be duplicative. Opinion and Order 11–12, Doc #: 78. Thus, the Court addresses these three institutional defendants as one (i.e., Cuyahoga County).

Here, Plaintiff asserts a § 1983 claim against Defendant Cuyahoga County. A plaintiff may sue such a government entity (including its agents in their official capacities) if the entity's policies are responsible for a deprivation of the plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, since *Monell* violations must be premised on a showing of Constitutional violation by at least one individual, and based on the record neither of the two individual defendants—Defendant Mirolovich and Defendant Clack—has violated Plaintiff's constitutional rights, summary judgment must be granted for Cuyahoga County.

**V. Conclusion**

Because Plaintiff failed to file within the statute of limitations, his claims against Defendant Clack must be dismissed. Furthermore, Plaintiff's claims fail to demonstrate a

constitutional violation or willful, wanton, reckless, and negligent disregard. Finally, because no

constitutional violation on the part of any individual defendant has been shown, the claim against

Cuyahoga County must be dismissed. Therefore, the County Defendants' Motion for Summary

Judgment, Doc #: 59, is GRANTED. All claims against Defendant Clack and Cuyahoga County

are DISMISSED with prejudice.

        IT IS SO ORDERED.

*/s/ Dan A. Polster   Aug. 14, 2017*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**